

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00223-CR

---

DALE DEWAYNE FISHER, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,741

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

Dale Dewayne Fisher was stopped by an Upshur County Deputy Sheriff for a defective license plate bulb. During a subsequent search of the vehicle, the deputy discovered a gun, suspected counterfeit currency, and suspected methamphetamine. Fisher was arrested and charged with possession of more than four grams but less than 200 grams of a controlled substance with intent to deliver. At trial, Fisher moved to suppress the evidence found in the traffic stop, arguing that the stop was improperly prolonged beyond its purpose, but the trial court denied his motion. After a jury trial, Fisher was found guilty as charged, was sentenced to seventy-five years' imprisonment, and was fined $10,000.00.[1]

On appeal, Fisher argues that the trial court erred by denying his motion to suppress. We find that the trial court did not abuse its discretion in denying the motion to suppress and affirm the trial court's judgment.

## I.    Factual and Procedural Background

Deputy David Thompson of the Upshur County Sheriff's Office testified that on December 30, 2013, while patrolling U.S. Highway 259 near New Diana, Texas, he observed a 2002 GMC Yukon with a defective license plate light.[2] Thompson activated his overhead lights and pulled the vehicle over. The driver, who was slow to pull over, passed by several well-lit parking lots and finally stopped in a dark location. Thompson approached the driver's window

---

[1]The punishment range for the offense was enhanced due to a previous felony conviction. Fisher pled "true" to the enhancement allegation.

[2]Fisher does not challenge the propriety of the initial traffic stop.

and spoke with the occupants. He asked for their identification. The passenger, Bradley Leroy Thompson,[3] produced a State-issued identification card, but Fisher, the driver, could not locate his driver's license. Fisher gave Thompson his name and date of birth instead. Fisher told Thompson that he and Bradley were driving from Houston to New Boston.

Thompson testified that Fisher was calm and that he did not notice anything suspicious or out of the ordinary during this initial interaction. Thompson returned to his patrol car. He provided Fisher's and Bradley's identification information to his dispatcher and determined that although neither occupant had outstanding arrest warrants, both had a "lengthy history of narcotics and other offenses." Thompson called another officer to the scene, approached the car, and asked Fisher to "exit the vehicle and walk to the rear." As Fisher complied with Thompson's request, he noticed that Fisher was "getting nervous" and increasingly sweating to the point he was "drench[ed] with water" and "steadily wiping sweat from his head." The officer remembered that the temperature that night was in the "mid or upper twenties, low thirties" and that it was windy and cold.

Thompson then questioned Fisher about where he was driving from, when he left, and where he was going. Fisher stated that he was driving from Houston to New Boston and that he had left Houston between 2:00 and 3:00 p.m. that day. Fisher denied having anything illegal in his car, but he also denied consent to search. Thompson then spoke separately with Bradley, and Bradley said they had left Houston between 12:00 and 1:00 p.m. that day. Bradley said he did not know if there was anything illegal in the car, but said that they had stopped at Nacogdoches and

---

[3]In order to avoid confusion, this opinion will refer to Deputy Thompson as "Thompson" and Bradley Thompson as "Bradley."

3

Longview on their way. Thompson testified that Highway 259 is a major drug corridor. He also testified that when he spoke with Fisher at the rear of his car, he smelled burned marihuana on Fisher's clothing.

Thompson, a canine officer, retrieved his drug-sniffing dog, Chiva, from his patrol car. He had the dog perform an open-air search of the car. Thompson testified that Chiva gave a positive alert on the driver's window and that, after being let into the car, he gave another positive alert on the center console. In the center console, Thompson found a pistol, suspected counterfeit currency, and a substance later determined to be methamphetamine. Fisher and Bradley were arrested at that point.

Fisher was charged with possession of more than four grams but less than 200 grams of a controlled substance with the intent to deliver. He filed a motion to suppress the evidence found in the car, arguing that the stop and his detention were improperly prolonged beyond their purpose in violation of his constitutional rights. The trial court denied his motion, and the case proceeded to trial. An Upshur County jury convicted Fisher, and the court sentenced him to seventy-five years imprisonment and imposed a $10,000.00 fine.

I.    **Standard of Review**

"We review the trial court's decision to deny [Fisher's] motion to suppress evidence by applying a bifurcated standard of review." *Young v. State*, 420 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.) (citing *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd)). "Because the trial court is the exclusive trier of fact and judge of witness credibility at a

4

suppression hearing, we afford almost total deference to its determination of facts supported by the record." *Id.* (citing *State v. Ross*, 32 S.W.3d 853, 856–57 (Tex. Crim. App. 2000); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "We also afford such deference to a trial court's ruling on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor." *Id.* (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)).

We apply a de novo review to the trial court's application of the law and its determination of questions not turning on credibility. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd) "Since all evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of [Fisher's] motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case." *Young*, 420 S.W.3d at 141 (citing *Carmouche*, 10 S.W.3d at 328; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999)). "In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing, because the ruling was based on that evidence, rather than evidence introduced later at trial." *Id.* (citing *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996)).

## III. Analysis

In his sole point of error, Fisher contends that the trial court should have suppressed the evidence found in the car because, at the time he was ordered out of his car, his continued detention by the police was without sufficient cause, rendering the later search of his vehicle invalid.

### A. Legal Requirements to Justify a Prolonged Detention

"Police officers may stop and detain a person if they have a reasonable suspicion that a traffic violation is in progress or has been committed." *Id.* (citing *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992)). "A traffic stop is a detention and must be reasonable under the United States and Texas Constitutions." *Id.* (citing *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.)). "To be reasonable, a traffic stop must be temporary and last no longer than necessary to effectuate the purpose of the stop." *Evanoff v. State*, Nos. 11-09-00317-CR & 11-09-00318-CR, 2011 WL 1431520, at *5 (Tex. App.—Eastland Apr. 14, 2011, pet. ref'd) (mem. op., not designated for publication) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Davis*, 947 S.W.2d at 245)). "Reasonableness is measured in objective terms by examining the totality of the circumstances." *Young*, 420 S.W.3d at 142 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Spight v. State*, 76 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). "An investigative stop that is reasonable at its inception may violate the Fourth Amendment because of excessive intensity or scope." *Id.* (citing *Davis*, 947 S.W.2d at 243 (citing *Terry v. Ohio*, 392 U.S. 1 (1968))).

In the course of a routine traffic stop, the detaining officer may request a driver's license, car registration, and insurance; use that information to conduct a computer check for outstanding

arrest warrants; question the vehicle's occupants regarding their travel plans; and issue a citation. *Kothe v. State*, 152 S.W.3d 54, 63 n.36 (Tex. Crim. App. 2004) (citing *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003)); *Davis v. State*, 947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.). "If, during that investigation, an officer develops reasonable suspicion that another violation has occurred, the scope of the initial investigation expands to include the new offense." *Evanoff*, 2011 WL 1431520, at *5 (citing *Goudeau v. State*, 209 S.W.3d 713, 719 (Tex. App.—Houston [14th Dist.] 2006, no pet.)). "Reasonable suspicion must be founded on specific, articulable facts which, when combined with rational inferences from those facts, would lead the officer to conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Young*, 420 S.W.3d at 142 (citing *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)). Yet, the officer does not need to develop reasonable suspicion that a particular crime has been or is about to be committed; rather, the facts need only suggest "that something illegal was afoot." *United States v. Pack*, 612 F.3d 341, 355 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500, 509 (5th Cir. 2004)). If such facts exist, "the police [are] entitled, as long as they [act] with reasonable diligence, to pursue several plausible theories in attempting to resolve the suspicion that reasonably had been created . . . ." *Id.* "Whether the totality of the circumstances is sufficient to support an officer's reasonable suspicion is a legal question that we review de novo." *Evanoff*, 2011 WL 1431520, at *5 (citing *Madden v. State*, 242 S.W.3d 504, 511 (Tex. Crim. App. 2007)).

"When the reason for the stop has been satisfied, the stop must end and may not be used as a "'fishing expedition for unrelated criminal activity.'" *Id.* (quoting *Davis*, 947 S.W.2d at 243).

"Once the officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted only if there is reasonable suspicion to believe that another offense has been or is being committed." *Id*. (citing *Davis*, 947 S.W.2d at 243). Nevertheless, "[t]here is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Haas v. State*, 172 S.W.3d 42, 51–52 (Tex. App.—Waco 2005, pet. ref'd) (quoting *Brigham*, 382 F.3d at 511; *United States v. Sharpe*, 470 U.S. 675, 686 (1985)); *see also Kothe*, 152 S.W.3d at 64–65 ("[T]he Supreme Court has expressly rejected placing any rigid time limitations on *Terry* stops . . . ."); *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985) (refusing to establish bright-line rule that twenty minutes too long for *Terry* stop).

Yet, even actions which do not unduly prolong a traffic stop may violate the Fourth Amendment if (1) those actions are not related to the original purpose for the stop, (2) they take place after all matters related to the public safety purpose for the traffic stop have ended, and (3) the officer has not developed probable cause to search or reasonable suspicion to continue the detention before the related actions have ended. In *Rodriguez*, the United States Supreme Court held that a dog sniff performed after the officer had completed a warrant check and issued a warning citation violated the Fourth Amendment because it unnecessarily prolonged the traffic stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015). The Supreme Court rejected the government's argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation," holding that "[i]f an officer can

8

complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id*. at 1616 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  Instead, the Supreme Court focused on whether the extended act was an "ordinary inquir[y] incident to [the traffic stop]." *Id*. at 1615.  Noting that inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance . . . serve the same objective as enforcement of the traffic code:  ensuring that vehicles on the road are operated safely and responsibly," the Supreme Court distinguished the dog sniff at issue because "a dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id*. (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).  Thus, the dog sniff unreasonably prolonged the stop and was invalid under the Fourth Amendment even though only "seven or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." *Id*. at 1613.

Consequently, actions performed during a traffic stop may be categorized as either (1) actions related to the purpose for the traffic stop or (2) actions unrelated to the purpose for the traffic stop.  According to *Rodriguez*, related actions are generally those designed to "ensur[e] that vehicles on the road are operated safely and responsibly." *Id*. at 1615.  Yet, there is no prohibition against an officer performing unrelated actions while the related actions are being carried out. *See Muehler v. Mena*, 544 U.S. 93, 100–01 (2005) ("We have 'held repeatedly that mere police questioning does not constitute a seizure' . . . . [E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the

9

individual's identification; and request consent to search his or her luggage."). For example, while an officer is waiting for a response to the warrant and license check, another officer may lead a drug dog around the car to perform a free-air sniff even though the free-air sniff is unrelated to the purpose of the traffic stop. *See Illinois v. Caballes*, 543 U.S. 405, 406 (2005) (no Fourth Amendment violation found where second officer "walked his dog around respondent's car" while first officer "was in the process of writing a warning ticket"). But all unrelated actions must be completed during the time it takes to complete the related actions; once the related actions have been completed, the officer must stop all unrelated actions and let the driver leave unless he developed probable cause to search or reasonable suspicion to continue the detention before the related actions were completed. *See Rodriguez*, 135 S.Ct. at 1615 (drug dog sniff initiated by second officer seven to eight minutes after first officer completed traffic stop and issued citation violated Fourth Amendment). Additionally, an officer cannot be dilatory in performing the related actions to create more time to complete the unrelated actions. *Caballes*, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

Therefore, under *Rodriguez*, Fourth Amendment considerations are both qualitative and temporal; related actions which unduly prolong a stop and unrelated actions performed after completion of the actions related to the traffic stop's purpose are both Fourth Amendment violations. Accordingly, the key inquiry is whether the information upon which probable cause or reasonable suspicion exists was obtained before the tasks related to the traffic stop's original public safety purpose were completed. If Thompson did not have probable cause to search or reasonable

10

suspicion to continue the detention at the point when the related actions were completed, then the detention became illegal at that point, and any evidence seized thereafter is the product of an illegal search and seizure.[4]

As mentioned, Thompson testified that after he initially approached the vehicle, asked Fisher about his destination and travel plans, and obtained his identification and registration information, Thompson did not observe anything suspicious about the car or the occupants. When Thompson returned to his vehicle, he learned that the license and registration checked out, that the vehicle was not stolen, and that there were no outstanding arrest warrants for either occupant (although both had significant criminal histories). All information leading to reasonable suspicion was obtained after Thompson returned to the vehicle and spoke to Fisher the second time. Therefore, in resolving this case, we must decide whether Thompson's continued questioning of Fisher and Bradley after he had completed the warrants and registration check was related to the original purpose for the traffic stop, i.e., whether it "serve[d] the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S.Ct. at 1615. [5]

---

[4]The facts in *Rodriguez* presented a clear case where actions unrelated to the traffic stop's original public safety purpose occurred after the related actions had been completed. That demarcation is not so clear in the present case. Yet, the framework set forth in *Rodriguez* is still applicable. Essentially, the issue in this case boils down to the following question: what did Thompson know and when did he know it? In other words, does the information within Thompson's knowledge constitute probable cause to search or reasonable suspicion to continue the detention and did he know that information before he completed all the tasks related to the public safety purpose for the traffic stop? If the answer to either question is no, then the evidence seized is the product of an illegal search and seizure.

[5]*Rodriguez* also holds that even if the officer has not completed the tasks related to the original public safety purpose of the traffic stop, but there is evidence the officer was dilatory in doing so in order to "buy more time" to search, then the search can be illegal even if the officer is still performing related actions, but that issue is not present here. *See Rodriguez*, 135 S.Ct. at 1616.

11

**B. Application to the Present Case**

       **1. The Traffic Stop Had Not Ended when Thompson Questioned Fisher the Second Time Because Thompson Had Not Yet Issued a Citation or Warning to Fisher**

First, issuing a citation or a warning is related to the original public safety purpose for the traffic stop. Although the record does not reveal whether Thompson intended to issue a citation or warning to Fisher when he asked Fisher to step to the back of the car the second time, "[t]raffic stops are 'especially fraught with danger to police officers'. . . , so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 1616 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Such "negligibly burdensome precautions" include asking the driver or occupant to step to the rear of the vehicle to issue the citation or warning. *Id.*; *see Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription against unreasonable searches and seizures.")). Thus, Thompson was permitted to ask Fisher to step to the rear of the vehicle a second time to conclude the stop, and when he did so, Thompson smelled an odor of burnt marihuana and saw Fisher sweating heavily despite the winter weather conditions. At that point, in light of his knowledge of Fisher's prior drug-related criminal history, Thompson had reasonable suspicion "that something illegal was afoot" even if the illegality was simply that Fisher was driving while intoxicated. *See Pack*, 612 F.3d at 355. Accordingly, Thompson was permitted to continue detaining Fisher and Bradley to further investigate that reasonable suspicion.[6]

## 2. Thompson's Questioning of Bradley Was also Related to Traffic Safety, and Therefore, the Purpose for the Traffic Stop Did Not End Until Thompson Finished Questioning Bradley

In addition, cases from the federal courts demonstrate that questions about a driver's origination, destination, and travel purpose are related to the general purposes for a traffic stop because of their potential to determine the existence of an extenuating circumstance or driver impairment. For example, the United States Court of Appeals for the Fifth Circuit has held that "by posing these types of questions at the outset of a stop, an officer may discover an extenuating circumstance, e.g., that a given driver was speeding in order to get his pregnant wife to the hospital." *United States v. Brigham*, 382 F.3d 500, 508 n.6 (5th Cir. 2004). The Eighth Circuit Court of Appeals has held that questions about a driver's origination and destination are related to a traffic stop because "all of [the officer's] questions were reasonably related to ascertaining the reasons for [the driver's] erratic driving and whether he posed a danger to others on the road." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993). Likewise, the Tenth Circuit Court of Appeals has held that

> [t]ravel plans typically are related to the purpose of a traffic stop because the motorist is travelling at the time of the stop. For example, a motorist's travel history

---

[6] As noted, there is no evidence here establishing whether Thompson intended to issue a citation or a warning at the point he asked Fisher to step to the rear of the vehicle. Yet, Thompson was clearly permitted to make that demand, and had he been writing a citation or warning when he noticed the smell of marihuana and Fisher's sweating, there would be no question that reasonable suspicion was obtained before the actions related to the traffic stop were completed. Therefore, to hold that Thompson could not develop reasonable suspicion under the circumstances present in this case would mean that an officer must ignore information he obtains as he completes the traffic stop unless he is actually writing out a citation or a warning at the time he makes the observation or he testifies at the suppression hearing that he intended to do so. This would elevate form over substance. Of course, an officer may not unduly prolong the process of issuing a citation or a warning in order to "buy more time" to conduct a "fishing expedition," but as will be discussed below, there is no evidence of any undue delay present in this case. *Davis*, 947 S.W.2d at 243; *Evanoff*, 2011 WL 1431520, at *5.

13

and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel).

*United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001).[7]

Of course, questions about a driver's travel plans may appear more closely related to roadway safety when the stop is based on a moving violation rather than an equipment malfunction, but that fact alone is not determinative. Questioning during a stop based on an equipment malfunction may nevertheless yield an extenuating circumstance that is relevant to roadway safety. The potential safety-related issue may not be apparent until after the questions are asked.[8] Consequently, questions regarding a driver's travel plans are "ordinary inquiries incident to [the traffic] stop" and "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."[9] *Rodriguez*, 135 S.Ct. at 1615.

Similarly, questioning of a passenger or passengers might also reveal the presence of an impairment or extenuating circumstance which creates a public safety issue, because a passenger may reveal information that the driver may deny. In this case, for instance, the smell of marihuana

---

[7]In *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007), the Eighth Circuit Court of Appeals rejected language from *Barahona* and other similar cases to the extent they suggested that questions during a traffic stop had to be related to the purpose of the stop, noting that in *Muehler*, 544 U.S. at 100–01, the Supreme Court "rejected the suggestion that questioning on a matter unrelated to the purpose of a detention constituted 'a discrete Fourth Amendment event.'" In *United States v. DeLaCruz*, 703 F.3d 1193, 1197 n.5 (10th Cir. 2013), the Tenth Circuit reached the same conclusion about *Holt* that the Eighth Circuit reached about *Olivera-Mendez*. Thus, the justifications for asking about the purpose of the driver's trip discussed in those cases are still valid.

[8]For example, a stop based on a defective tail-light may, upon questioning, lead the officer to conclude that the driver is impaired even though he did not commit a moving violation within the officer's view.

[9]It is important to note that whether the act of questioning relates to public safety does not turn on whether the questioning actually reveals a public safety issue, but on whether the questioning is reasonably likely to reveal one if it exists.

on Fisher's person and his heavy sweating were facts which could have indicated an impairment, and Bradley could have provided information which revealed an actual impairment. Therefore, even had Thompson not developed reasonable suspicion during his second conversation with Fisher, the purpose of the traffic stop in this case was still not completed until after Thompson questioned Fisher *and* Bradley about their origination, destination, and travel purpose, and we find that his questions were related to that purpose.[10]

### 3. Thompson Was Not Dilatory in Questioning Fisher or Bradley and Did Not Overly Prolong the Traffic Stop

Moreover, nothing in the record suggests that Thompson deliberately delayed questioning Fisher or Bradley as a pretext to conduct a "fishing expedition." Although we do not have a recording of the stop, the testimony established that Thompson's questioning of Bradley occurred directly after the second conversation with Fisher, which occurred directly after Thompson received the information about their warrant and criminal history. No witness testified that Thompson delayed his actions or that any significant period of time elapsed between the events. *See Kothe*, 152 S.W.3d at 66 ( "[T]here is no evidence—or even suggestion—that Deputy Forslund failed to diligently pursue his investigation. Nor is there any evidence that Officer Forslund ran the license check as a pretext to investigate an unrelated crime for which he had no reasonable suspicion. There is no suggestion that he engaged in any 'fishing expedition.'"). Thompson's actions were related to the traffic stop's purpose and did not unduly prolong that stop. Therefore,

---

[10]We do not hold that questioning a passenger is always related to the public safety purpose for the traffic stop, only that it was related in this case.

Fisher was being legally detained when Thompson developed the additional reasonable suspicion that justified the continued detention in this case.

### 4. Thompson Developed Reasonable Suspicion to Continue His Investigation Before His Questioning of Bradley Ended

Fisher does not dispute that by the time he had finished questioning Bradley, Thompson had sufficient articulable facts to establish reasonable suspicion "that something illegal was afoot" justifying Fisher's continued detention. *Pack*, 612 F.3d at 355. Nor could he, because at that point (a) Thompson had smelled the odor of burned marihuana on Fisher's clothing; (b) despite the windy and cold conditions with temperatures in the high twenties to low thirties, Thompson observed that Fisher was heavily sweating; (c) Fisher and Bradley gave Thompson conflicting answers about what time they left Houston; (d) Fisher was slow to pull over when Thompson activated his over-head lights, and in his experience, such behavior was suspicious; and (e) although no arrest warrants were outstanding, both Fisher and Bradley had lengthy criminal records involving narcotics and other offenses. *See Powell v. State*, 5 S.W.3d 369, 378 (Tex. App.—Texarkana 2000, pet. ref'd) (continued post-citation detention justified by nervousness, conflicting information, prior drug offenses, and car not being registered to any of vehicle's occupants).[11] By the time Thompson's questions about Fisher and Bradley's travel plans ended, he had sufficient reasonable and articulable facts establishing reasonable suspicion that a drug

---

[11]*Powell* was subsequently called into doubt by our decision in *Corbin v. State*, 33 S.W.3d 90, 93 (Tex. App.—Texarkana 2000, pet. granted), but that decision was reversed by the Court of Criminal Appeals in *Corbin v. State*, 85 S.W.3d 272 (Tex. Crim. App. 2002). Consequently, *Powell* remains valid.

offense was occurring or had occurred that justified continuing the investigative detention even further.

### 5. Thompson's Reasonable Suspicion Rose to Probable Cause After the Drug Dog Alerted

Finally, during that continued detention, Chiva performed a "free air sniff" and alerted to the driver's side door and the console during the period of continued detention after the reasonable suspicion was developed. This was lawful under the Fourth Amendment. *Caballes*, 543 U.S. at 410 ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."). Once Chiva alerted, Thompson's reasonable suspicion rose to the level of probable cause sufficient to search the inside of the vehicle without a warrant. *Branch v. State*, 335 S.W.3d 893, 901 (Tex. App.—Austin 2011, pet. ref'd). Consequently, the detention and subsequent search of Fisher's vehicle was proper, and the trial court did not abuse its discretion in so finding.[12]

---

[12]In *Rodriguez*, the dog sniff rendered the continued detention invalid, but only because it occurred before the officer obtained reasonable suspicion to justify the continued detention at issue. *Rodriguez*, 135 S.Ct. at 1615. The dog sniff was the event which created the reasonable suspicion relied upon by the government to justify the continued detention in *Rodriguez*. *Id*. at 1615. Here, by contrast, the dog sniff occurred after Thompson had already developed reasonable suspicion of illegal activity and was performed to further investigate that already-existing reasonable suspicion.

17

## IV.    Conclusion

For the foregoing reasons, we overrule Fisher's sole point of error and affirm the trial court's judgment.


                                        Ralph K. Burgess
                                        Justice


Date Submitted:    July 28, 2015
Date Decided:      December 10, 2015

Publish