

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00047-CR

_____

BRANDON BROWN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 15F0579-202

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Brandon Brown was convicted of murdering Christopher Guilbeau and was sentenced to fifty years' imprisonment. On appeal, Brown argues that (1) the trial court erred in failing to grant his motion to suppress, (2) the evidence is legally insufficient to support the trial court's finding of guilt, and (3) the evidence is insufficient to support the assessment of $234.00 in court costs.

We affirm the trial court's judgment because (1) Brown's motion to suppress was properly overruled, (2) sufficient evidence supports Brown's conviction, and (3) the amount of assessed court costs is supported in the record.

*(1)     Brown's Motion to Suppress Was Properly Overruled*

Brown argues that the trial court should have granted his suppression motion. In this regard, Brown argues both that the trial court should have suppressed the statements Brown made during police interrogation after he mentioned trying to obtain an attorney and that Brown's arrest was not supported by probable cause. We disagree with both arguments.

We review the trial court's decision to deny Brown's motion to suppress by applying a two-level standard of review. *See Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd). Because the trial court is the exclusive trier of fact and judge of witness credibility at a suppression hearing, we afford almost total deference to its determination of facts supported by the record. *State v. Ross*, 32 S.W.3d 853, 856–57 (Tex. Crim. App. 2000); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We also afford such deference to a trial court's rulings on application-of-law-to-fact

2

questions, also known as mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *See Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). While we defer to the trial court's determination of historical facts and credibility, we review without such deference its application of the law and its factual determinations not turning on credibility and demeanor. *Carmouche*, 10 S.W.3d at 332; *Guzman*, 955 S.W.2d at 89; *Graves*, 307 S.W.3d at 489.

Since all evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of Brown's motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case. *See Carmouche*, 10 S.W.3d at 328; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

First, we conclude that Brown did not unequivocally request counsel during his interrogation. This Court has recently written:

> If a suspect requests counsel at any time during a custodial interview, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458, (1994). This secondary *Miranda*[1] right to counsel is "'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Id*. (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, (1988)). "A suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present." *Id*. However, in the context of invoking the *Miranda* right to counsel, a suspect must do so "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then an officer is required neither to end the interrogation nor ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights. *Davis*, 512 U.S. at 459.

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

The United States Supreme Court has observed that a "'statement either is such an assertion [of the right to counsel] or it is not.'" *Smith v. Illinois*, 469 U.S. 91, 97–98 (1984) (quoting *People v. Smith*, 466 N.E.2d 236, 241 (Ill. 1984) (Simon, J., dissenting) (alteration in original)). To unambiguously invoke his right to counsel, a suspect need not "speak with the discrimination of an Oxford don," *Davis*, 512 U.S. at 476 (Souter, J., concurring in judgment), but he "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," *Davis*, 512 U.S. at 459. If the suspect's statement fails to meet that level of clarity, the officers do not have to cease questioning the suspect. *Id.*

*Beham v. State*, 476 S.W.3d 724, 729–30 (Tex. App.—Texarkana 2015, pet. granted).

Before the interrogation in this case, Brown was informed of his right to counsel and the right to terminate the interview at any time. He signed a written waiver of those rights, among others, and informed the officers of the events leading up to the murder. After hearing Brown's initial account, the officers took a break and left Brown in the interrogation room. The context of the interview established that police officers were also interrogating another suspect, Marquell "Pig" Smith in another room. When the officers returned, the following discussion ensued:

> Brown:     Is there a way I can get a hold of . . . I be trying to get a hold of my people? I am going to try and get me a lawyer or something. You know what I am saying?
>
> Officer 1:     He's worked on making those phone calls, I don't know if he has had any luck with them okay.
>
> Brown:     Damn, I need me a lawyer. Cuz I am sitting here telling you the truth man.
>
> Officer 1:     Nobody has accused you of not telling us the truth. But what I am going to ask you is this, a couple things all right. I am telling you there's just a couple differences, not a lot, in the stories the two of you have said and you just mentioned an attorney, if you want an attorney . . . .
>
> Brown:     No, I said . . . .

4

Officer 1:    . . . then I can't talk to you.

Brown:    No, no, listen . . . the only reason why I asked for an attorney cuz I really telling ya'll the truth, cuz I am trying to get out this shit.  You know what I am saying.

Officer 2:    I understand.

Brown:    And I don't want ya'll to think I am bull-shitting ya'll.  Cuz everything I . . . especially since yesterday . . . .

Officer 2:    Right . . . . We want to make sure you want to talk to us.

Brown:    I am still going to talk man, I still want to talk . . . .

Officer 2:    Without a lawyer?

Brown:    Without a lawyer.  I still want to talk . . . you know what I am saying.  I was just asking if there would be a possibility I could get in contact with my people to try and get try and get one.

Officer 1:    We are working on getting all that stuff lifted where you can get your phone privileges and all that stuff . . . .

Brown continued with the interrogation.

We have previously held that similar statements failed to definitively request counsel.  In

*Beham*, the following occurred during police interrogation:

Beham:    I was gonna try to see if I could get a lawyer.

[Officer]:    Okay.

Beham:    My pops told me to get a lawyer—you get a lawyer for me.

[Officer]:    Okay, so you don't want to talk?

Beham:    Aaahh, I [unintelligble] want to talk to the lawyer and see what's going on.

[Officer]:    Okay.  So you don't even know why I'm here then, huh?

5

Beham:      Yea, they said that—that you had to talk to me about something.

[Officer]:   Okay.

Beham:      —bout, bout something, about uh, about the girl that I was with at the uh, Walmart.

[Officer]:   Mmhmm.  Do you want to talk about that?

*Id.* at 730.  Beham then continued his account, but was stopped by the officer, who said, "Well, I'm kind of in a bind here.  Either we want to discuss it or we don't.  Like I said, if it gets too hot on you, you can shut her down, man—is what I'm talking about."  *Id.*  In response, Beham said, "I'll see what you got to say first."  *Id.*  He signed a statement acknowledging his rights and later confessed to his involvement in the robbery.  *Id.*

There, we held that "Beham did not clearly and unambiguously invoke his right to counsel and that a reasonable officer in light of the circumstances would have understood only that Beham 'might be invoking the right to counsel.'"  *Id.* at 731 (quoting *Davis v. State*, 512 U.S. 452, 459 (1994)).  Accordingly, we found that the trial court properly denied Beham's motion to suppress.

Similarly, Brown's first statement that he was "going to try and get me a lawyer" "fail[ed] to definitively request counsel."  *See id.*  An officer explained that he could not pursue the interview if Brown wanted a lawyer present.  When the officers again asked whether Brown wanted to continue the interrogation without a lawyer, rather than clearly invoking his right to counsel, Brown said he wished to continue the interrogation without counsel.  As in *Beham*, we conclude that Brown did not unequivocally invoke his right to counsel.  Instead, we find Brown's "reference to an attorney . . . ambiguous or equivocal in that a reasonable officer in light of the

6

circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Id.* at 730 (quoting *Davis*, 512 U.S. at 459). Accordingly, the officers were "required neither to end the interrogation nor ask questions to clarify whether [Brown] want[ed] to invoke his . . . *Miranda* rights." *Id.* Consequently, we conclude that the trial court did not abuse its discretion in denying Brown's motion to suppress the statements made during his interrogation.

We also conclude that the evidence supports a finding that Brown's arrest was supported by probable cause.

Guilbeau's stepfather, John Cates, testified that he spoke with Guilbeau every two or three days. In late February, after a week of unsuccessful attempts to contact him, Cates travelled to Guilbeau's apartment, but no one answered the door. Guilbeau's roommate reported that he had not seen Guilbeau since February 20, 2015. In March, the apartment complex informed Cates that Guilbeau's rent had not been paid and requested that Cates gather and move all of Guilbeau's personal belongings from the apartment. In doing so, Cates found drug paraphernalia, which heightened his concern for Guilbeau's safety. On March 4, 2015, Cates filled out a missing person report with the police. Cates told officers that Guilbeau drove a white, four-door Dodge pickup truck, which was "his only means of transportation" and "the last thing he'd loan out."

Initially, Bobby Jordan, a captain with the Texarkana, Arkansas Police Department (TAPD), simply published a request to law enforcement to be on the lookout (BOLO) for Guilbeau's vehicle. However, Jordan became increasingly concerned after he began investigating the case and modified the BOLO to include a request to detain anyone in the vehicle for questioning unless Guilbeau was found in it. Jordan discovered that a bag containing Guilbeau's

7

clothing, driver's license, and credit cards was found on February 24, 2015, in an alleyway by a citizen who reported the discovery to the Texarkana, Texas Police Department. When Jordan ran Guilbeau's license plate number, he found that it was documented as having run a red light in Dallas, Texas, on February 28 and that it "had been encountered by two different law enforcement officers in Oklahoma." Real-time tracking of Guilbeau's cell phone revealed that it was not in a location that he was known to frequent, and examination of phone records showed that "[t]here had been some mysterious phone calls or answers when people had called his phone." Thus, the TAPD elevated the status of Guilbeau's vehicle as stolen.

The vehicle was found on March 5, 2015, in Oklahoma. Greg Mitchell, an officer with the Tulsa Police Department, testified that he pulled the truck over for speeding. In the course of running the tag number, Mitchell saw that it was connected with a missing person report. Mitchell also read the BOLO asking officers to detain persons inside the vehicle if Guilbeau was not found in it and contacted the TAPD to report that he had stopped the vehicle. The TAPD and the Tulsa Police Department continued to communicate during the traffic stop via teletype. Mitchell testified that Brown was driving the vehicle, Jacharia Bennett was the front seat passenger, Smith was seated in the back, and Guilbeau was nowhere to be seen. Mitchell was also made aware that TAPD reported the truck as stolen. According to Mitchell, Brown said that his friend Eddie had loaned him the truck. After hearing inconsistent stories from Bennett and Smith, Mitchell arrested Brown for theft of Guilbeau's vehicle. The day after Brown's arrest, Guilbeau's body was located and identified.

Law enforcement officers may stop and briefly detain individuals suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). "Police officers may stop and detain a person if they have a reasonable suspicion that a traffic violation is in progress or has been committed." *Fisher v. State*, 481 S.W.3d 403, 407 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting *Young v. State*, 420 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.) (citing *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992)).[2] "On a routine traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information." *Kothe v. State*, 152 S.W.3d 54, 63–64 (Tex. Crim. App. 2004). "It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved." *Id.*

"If, during that investigation, an officer develops reasonable suspicion that another violation has occurred, the scope of the initial investigation expands to include the new offense." *Fisher*, 481 S.W.3d at 407. If an investigation based on reasonable suspicion leads to probable cause that the suspect has committed a crime, then police may make a formal arrest. *See Griffin v. State*, 215 S.W.3d 403, 410 (Tex. Crim. App. 2006) (citing *Terry*, 392 U.S. at 10). Here, Mitchell's investigation of the traffic stop lead him to the discovery that the truck was reported stolen. Yet,

> both the trial and reviewing courts must proceed cautiously when it appears that the
> detaining officer acted on nothing other than a radio dispatch or request to

---

[2]Brown does not argue that Mitchell did not have reasonable suspicion to initiate the traffic stop.

9

> apprehend. In that situation, the focus lies on the information known to the officer who made the broadcast. . . . [T]he State must . . . present evidence justifying said officer's broadcast or request; in other words, it must be shown that the officer who made the stop or arrest did so on the request of someone who had reasonable suspicion or probable cause. It is not enough to merely show that a stop was made because another officer requested it.

*Boyett v. State*, 485 S.W.3d 581, 590 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *State v. Jennings*, 958 S.W.2d 930, 933 (Tex. App.—Amarillo 1997, no pet.) (citations omitted)).

"An arrest is valid under Texas law if the arresting officer had probable cause with respect to the person being arrested as well as statutory authority to make the arrest." *Neal v. State*, 256 S.W.3d 264, 280 (Tex. Crim. App. 2008); *Parker v. State*, 206 S.W.3d 593, 596 (Tex. Crim. App. 2006). "'Probable cause' for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see Parker*, 206 S.W.3d at 599 ("[P]robable cause is the accumulation of facts which, when viewed in their totality, would lead a reasonable officer to conclude, with a fair probability, that a crime has been committed or is being committed by someone."). "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Amador*, 275 S.W.3d at 878 (citations omitted); *see State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

"Also, we do not just look at what the detaining officer knew; rather, in evaluating whether reasonable suspicion exists, 'we must evaluate the collective information of all the officers.'"

10

*Boyett*, 485 S.W.3d at 590 (quoting *Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982)). "Thus, 'the operative circumstances are not only those known to the officer making the stop or arrest. They include those collectively known by the officers or agents cooperating together at the time of the detention.'" *Id.* (quoting *State v. Jennings*, 958 S.W.2d 930, 933 (Tex. App.— Amarillo 1997, no pet.)).

Here, Jordan spoke with Cates in connection with the missing-person report. According to Jordan, Cates also reported that Guilbeau's vehicle was missing and said that Guilbeau would not have loaned his vehicle to anyone. Jordan noted that the vehicle was in Dallas and Oklahoma after Guilbeau went missing. Jordan also knew that someone other than Guilbeau had answered Guilbeau's phone. Guilbeau was not in the truck when Mitchell stopped it. Brown, who was driving the vehicle, told Mitchell that a friend named Eddie had allowed him to borrow the truck. Because Mitchell ran the truck's license plate, he knew that it belonged to Guilbeau, not someone named Eddie. Moreover, Smith and Bennett gave different accounts of how Brown came to possess the vehicle, which further supported a conclusion that Brown was lying. We find that the totality of the circumstances would lead a reasonable officer to conclude, with a fair probability, that Brown stole Guilbeau's truck.

Because Brown did not unequivocally invoke his right to counsel and because probable cause for his arrest was established, the motion to suppress was properly denied. Accordingly, we overrule this point of error.

11

*(2)*     *Sufficient Evidence Supports Brown's Conviction*

Brown argues that the evidence was insufficient to establish that he acted with the intent to promote or assist the commission of murder. Because the State was not required to prove such intent, we disagree that its failure to do so undermines this conviction.

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

As Brown points out, the evidence in this case was largely uncontested. Guilbeau was a methamphetamine dealer. He asked Devonte Evans, a homeless man, if he knew anyone who wanted to buy methamphetamine. Evans testified that, based on his time on the streets with Smith, he believed that Smith would be likely to purchase the drugs. After Guilbeau offered Evans cash to broker a deal, Evans climbed into Guilbeau's truck and provided directions to an apartment occupied by Smith and his girlfriend, Shamari Newton. Evans testified that Guilbeau remained in his truck while he knocked on the door, which Brown answered. Evans informed Smith that

12

Guilbeau had drugs for sale and returned to the truck after Smith indicated he was on his way down.

Newton testified that she overheard Brown and Smith's conversation after Evans left the apartment. According to Newton, Brown asked Smith if he needed a gun and handed Smith his own weapon. Brown remained in the apartment while Smith went to meet Guilbeau and Evans. Evans testified that he witnessed Smith coming down the stairs with his hands inside of his sweatpants. Smith climbed into the back seat and began negotiating a price for the drugs. Evans testified that he heard an awkward silence and turned to find Smith brandishing a weapon. According to Evans, Smith instructed Guilbeau to hand over the drugs and, before Guilbeau had a chance to speak or act, Smith fired the gun as Guilbeau attempted to leave the vehicle. Evans said Smith fired two more rounds from Brown's gun, killing Guilbeau. Then, Smith threatened Evans with the gun, told him to keep his mouth closed, and instructed him to go back upstairs to the apartment.

Newton testified that she heard the gunshots from inside of the apartment. According to Evans, Brown immediately asked Smith if he had killed Guilbeau. When Smith replied affirmatively, Newton started panicking. Smith then warned her to calm down before he decided to shoot her also. Evans testified that he left the apartment after he refused Brown and Smith's request to get rid of the truck. Brown served as a lookout while Smith hid Guilbeau's body. According to Newton, Brown and Smith decided to try and sell the truck in Oklahoma, and they left the scene with Brown behind the wheel.

Matt Cashatt, a detective with the Texarkana, Texas Police Department, testified that Brown admitted to providing the weapon for "use in a robbery [but] insisted that he did not provide his gun to be used to kill anyone."[3] Brown sold the gun after the murder.

Brown was convicted as a party to the offense of murder. Under the law of parties, as codified by Section 7.02:

> (a)     A person is criminally responsible for an offense committed by the conduct of another if:
>
> . . . .
>
> (2)     acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . .
>
> (b)     If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02 (West 2011). "A person can be convicted of . . . murder as a party to the offense, without having had the intent to commit the murder." *Smith v. State*, 424 S.W.3d 588, 595 (Tex. App.—Texarkana 2013, no pet.) (citing *Ex parte Martinez*, 330 S.W.3d 891, 901–02 (Tex. Crim. App. 2011)).

Here, the State was not required to prove that Brown acted with intent to promote or assist the commission of murder. *Id.* at 596. Rather, it needed to prove only a conspiracy to commit

---

[3]In his recorded interview, Brown told officers that Evans announced that he "got a lick." Brown said he gave Smith the weapon after Smith clarified that the "lick" was "on some ice" and that he wanted to purchase it. It was established at trial that the term "lick" could have several innocent meanings, but Cashatt testified that the term "lick" is often used to reference a theft or robbery. Given this testimony, the trial court could have validly resolved the conflicting evidence by determining that Smith told Brown he was going to rob Guilbeau.

14

robbery, during which crime a murder was committed that should have been anticipated. *Id.*

Under Section 15.02 of the Texas Penal Code,

> (a)     A person commits criminal conspiracy if, with intent that a felony be committed:
>
> > (1)     he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and
> >
> > (2)     he or one or more of them performs an overt act in pursuance of the agreement.
>
> (b)      An agreement constituting a conspiracy may be inferred from acts of the parties.

TEX. PENAL CODE ANN. § 15.02 (West 2011).

The evidence in this case, viewed in a light most favorable to the trial court's finding of guilt, established that Smith told Brown he was going to rob Guilbeau. Thus, the trial court could have concluded that the murder was committed in furtherance of the robbery. Brown supplied Smith with his weapon after Smith informed him of the "lick." From this act, the trial court could infer an agreement constituting a conspiracy to rob Guilbeau. Because Brown supplied a deadly weapon to Smith for use during the robbery of a drug dealer, the trial court could also have found that Brown should have anticipated the killing. "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Jackson v. State*, 487 S.W.3d 648, 655 (Tex. App.—Texarkana 2016, no pet.) (quoting *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985)). The evidence

15

established that Brown assisted Smith while he was hiding Guilbeau's body, stole Guilbeau's truck, and sold the murder weapon.

We find that the evidence is legally sufficient to support the trial court's finding of guilt. Accordingly, we overrule this point of error.

*(3)    The Amount of Assessed Court Costs Is Supported in the Record*

A challenge to the sufficiency of the evidence supporting court costs is reviewable on direct appeal in a criminal case. *See Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011). We measure the sufficiency of the evidence supporting an assessment of court costs by reviewing the record in the light most favorable to the assessment. *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010). If a criminal action is appealed, "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is transferred or appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006)). "[A] cost is not payable by the person charged with the cost until a written bill containing the items of cost is:  (1) produced; (2) signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost; and (3) provided to the person charged with the cost."' TEX. CODE CRIM. PROC. ANN. art. 103.001 (West Supp. 2017). The Rules of Appellate Procedure permit supplementation of the clerk's record "[i]f a relevant item has been omitted." TEX. R. APP. P. 34.5(c)(1)).

"The code of criminal procedure does not require that a certified bill of costs be filed at the time the trial court signs the judgment of conviction or before a criminal case is appealed." *Ballinger v. State*, 405 S.W.3d 346, 348 (Tex. App.—Tyler 2013, no pet.) (citing TEX. CODE CRIM.

16

PROC. ANN. arts. 103.001, 103.006). "But when a trial court's assessment of costs is challenged on appeal and no bill of costs is in the record, it is appropriate to supplement the record pursuant to Rule 34.5(c) because a bill of costs is required by Article 103.006." *Id.* (citing TEX. R. APP. P. 34.5(c); TEX. CODE CRIM. PROC. ANN. art. 103.006)). "Supplementing the record to include the bill of costs is appropriate and does not violate due process." *Id.*

The clerk's record in this case did not originally include a bill of costs. However, the clerk's record was later supplemented to include an itemized bill of costs, which supports the amount of court costs assessed. Accordingly, we overrule this point of error as moot.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     January 2, 2018
Date Decided:      January 12, 2018

Do Not Publish

17